IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KAREN A. BATTLE,                    )
                                    )
          Plaintiff,                )
                                    )
     v.                             )          1:21-cv-698
                                    )
WAKE FOREST UNIVERSITY BAPTIST      )
MEDICAL CENTER,                     )
                                    )
          Defendant.                )


<u>**MEMORANDUM OPINION AND ORDER**</u>

**OSTEEN, JR., District Judge**

     Before this court is Defendant's Motion for Summary
Judgment. (Doc. 20.) Defendant seeks summary judgment on
Plaintiff's claims for hostile work environment, race
discrimination, and retaliation. (<u>Id.</u>) Defendant's motion will
be granted as to Plaintiff's race discrimination claim and
denied as to Plaintiff's hostile work environment and
retaliation claims.

**I.    <u>FACTUAL BACKGROUND</u>**

     In November 2018, Plaintiff Karen Battle began working for
Hickory Surgical Services ("Hickory") as a Patient Services
Representative ("PSR") III. (<u>See</u> Am. Compl. (Doc. 9) ¶ 6;
Answer Am. Compl. (Doc. 11) ¶ 6; <u>see also</u> Dep. of Karen Battle

("Battle Dep.") (Doc. 21-2) at 17.)[1] Sandra Cleary interviewed
and hired Plaintiff for the position. (Battle Dep. (Doc. 21-2)
at 18.) When Plaintiff's employment began,[2] Hickory was operated
by nThrive. (See Decl. of Sandra Cleary ("Cleary Decl.")
(Doc. 21-7) ¶ 4.) On January 1, 2020, all Hickory employees
became employees of Defendant Wake Forest Baptist Medical
Center ("WFBMC"). (See id. ¶¶ 4-5.)

When Plaintiff began working at Hickory, she reported to
Regional Supervisor Paula Buchanan. (Cleary Decl. (Doc. 21-7)
¶ 9.) Buchanan resigned in or around February 2020 or June
2020; Felicia Lynch replaced Buchanan as Regional Supervisor.
(See id.; Battle Dep. (Doc. 21-2) at 19.) Buchanan, and later
Lynch, reported to Cleary, a Regional Manager in Patient
Access. (See Battle Dep. (Doc. 21-2) at 19; Cleary Decl.
(Doc. 21-7) ¶ 9.) Cleary reported to Director Gina Freeman, and
later to Michelle Reed (who succeeded Freeman as Director).

---

[1] All citations in this Memorandum Opinion and Order to
documents filed with the court refer to the page numbers
located at the bottom right-hand corner of the documents as
they appear on CM/ECF.

[2] It is unclear from the record whether Plaintiff began
working at Hickory Surgical Services in November 2018 or
November 2019. Plaintiff stated in her deposition her
employment commenced in 2019. (Battle Dep. (Doc. 21-2) at 17-
18.) However, Plaintiff's EEOC charge states her employment
began in 2018. (Dep. of Karen Battle ("Battle Dep. Cont'd.")
(Doc. 21-3) at 41.) Regardless, this issue is not a material
fact for purposes of the instant motion.

(Cleary Dep. Tr. ("Cleary Dep.") (Doc. 21-9) at 22.) Freeman and Reed are both Black. (See Battle Dep. (Doc. 21-2) at 66-67, 85.) Lynch and Cleary are both White. (See Catherine McMath Dep. ("McMath Dep.") (Doc. 21-12) at 28.)

Around the time Plaintiff joined Hickory, Cleary also hired Angela McMahan as a PSR. (Cleary Decl. (Doc. 21-7) ¶ 7.) Three other PSRs, LaShonda Peterson, Stacy Collins, and Tanya Loehman, also worked at Hickory. (See Cleary Dep. (Doc. 21-9) at 35-37.) Plaintiff is Black. (See Am. Compl. (Doc. 9) ¶ 4; Answer Am. Compl. (Doc. 11) ¶ 4.) McMahan is White. (See McMath Dep. (Doc. 21-12) at 32-33.)

A list of primary duties and expectations for Plaintiff stated, inter alia, she was to work from "8:00am - 5:00pm with [a] one hour lunch[;] . . . [p]re-register all patient accounts to be 5-7 days out; . . . [c]ommunicate issues affecting coworkers in a timely and appropriate manner[;] [and] [c]ommunicate with leader[s] if coming in late or leaving early." (Doc. 21-8 at 3.) PSRs were supposed to work forty hours per week and not accrue overtime. (Cleary Dep. (Doc. 21-9) at 43-44.) In the event they worked more than forty hours in a week, PSRs could face discipline. (See id. at 44.) PSRs were permitted to arrange with Lynch to make schedule

- 3 -

modifications, including to arrive early or work through some
of their lunch. (See id. at 46.)

Job duties for PSRs included "pre-registering patients,
answering the practice's telephone, and assisting with check-in
and check-out procedures. Pre-registration serves two important
purposes: First, verification of patient demographic
information prior to appointments, . . . and second,
facilitating patient flow." (Cleary Decl. (Doc. 21-7) ¶8.) PSRs
were also responsible for collecting past due accounts and co-
pays when they interacted with patients. (See Lynch Dep. (Doc.
21-22) at 60.) When checking in a patient or pre-registering a
patient over the phone, PSRs were supposed to ask patients to
pay any amounts owed. (Cleary Dep. (Doc. 21-9) at 48-50.) Each
month the PSRs were encouraged to meet a specific collection
goal. (Lynch Dep. (Doc. 21-22) at 60.)

When Plaintiff first started working at Hickory, her
workstation was at the front desk behind a plexiglass window
and looked out into the waiting room. (Battle Dep. (Doc. 21-2)
at 21.) Two other PSRs were also stationed at the front desk.
(See id. at 22.) In February 2020, Plaintiff's workstation
moved to a cubicle behind the front desk. (Id. at 23-24.)
Plaintiff could still see McMahan from her new workstation.
(Id. at 24.)

- 4 -

While many facts about Plaintiff's employment are contested and will be addressed below, the parties agree that Plaintiff was terminated on March 8, 2021. (Am. Compl. (Doc. 9) ¶ 28; Cleary Decl. (Doc. 21-7) ¶ 15.) Prior to her termination, Plaintiff was asked to attend an insurance class twice and refused to do so both times. (Battle Dep. (Doc. 21-2) at 145, 150.)

A.    **McMahan's Statements**[3]

Plaintiff alleges that on January 1, 2020, a Black patient with body odor came to the window to check out. (Id. at 38, 44-45.) After the patient left, McMahan said, "all dark-skin blacks stink" ("the dark-skin comment"), to Plaintiff and Peterson, the other PSR present at the front desk. (See id. at 38-39, 44-47.) McMahan proceeded to make this same comment every time a Black person with body odor used McMahan's window to check out — which Plaintiff stated was a near daily

---

[3] For purposes of the summary judgment record, Plaintiff's allegations as to McMahan's statements will be stated here as quoted to allow the parties to review the accuracy of this court's analysis of the record. However, regardless of whether the statements were in fact made or whether the statements are fairly attributed to McMahan, the statements are inflammatory and despicable and will not be quoted in full again.

- 5 -

occurrence — from January 1, 2020 until the day Plaintiff was terminated. (Id. at 39-41.)[4]

The following month, in February 2020, Plaintiff overheard a discussion between Peterson and McMahan in which McMahan stated that President Obama was not educated enough to be President ("the President Obama comment"). (Id. at 53-54.) McMahan then added, "[a]nd his wife, Michelle, looks like a monkey" ("the Michelle Obama comment"). (Id. at 55.) McMahan proceeded to: draw a picture of a monkey on a sticky note; show the drawing to Peterson and Plaintiff; say, "this is Michelle"; and hang it on her wall by the desk ("the monkey drawing"). (Id.) Upset by McMahan's comments, Peterson walked off and McMahan called her a "ghetto [B]lack bitch" ("the ghetto

---

[4] While this court shall not make credibility determinations at this stage, it notes that Plaintiff's two Equal Opportunity Employment Commission (EEOC) charges and deposition testimony all make contradictory statements about the alleged hostile work environment. Although factual allegations may naturally evolve as new information is uncovered during discovery, this court has concerns about statements Plaintiff made under oath.

For example, Plaintiff's first EEOC charge states that she was subjected to a racially hostile work environment beginning August 1, 2020 and that she reported the comments sometime thereafter. (Dep. of Karen Battle ("Battle Dep. Cont'd.") (Doc. 21-3) at 41.) However, in her deposition, Plaintiff states that the comments began eight months before, on January 1, 2020, and that she reported the comments to Buchanan the same day. (Dep. of Karen Battle ("Battle Dep.") (Doc. 21-2) at 26, 44.) Cleary stated in her affidavit that Hickory is not open on New Year's Day, (Cleary Decl. (Doc. 21-7) ¶ 6), and Plaintiff does not dispute that fact.

comment"). (Id. at 67-68.) McMahan then turned to Plaintiff and said, "how is that for being racist?" (Id. at 68-69.) Sometime after this initial interaction, McMahan and Peterson got into an argument and McMahan wrote "Mr. Potatoe Head" on the sticky note drawing. (Id. at 59; see also Battle Dep. Add'l Exs. (Doc. 21-4) at 3.)[5]

Later in February 2020, a Black patient with Medicaid insurance checked in for an appointment at the clinic; McMahan said to Plaintiff and Peterson "all [B]lack people are on the Caid" ("the Medicaid comment") (Battle Dep. (Doc. 21-2) at 63-64.) McMahan repeated this comment each time a Black person on Medicaid checked into the clinic — which occurred approximately 20 times per month — until Plaintiff was terminated. (Id. at 64.)[6]

Additionally, once in February and once in March, McMahan told Plaintiff that Gina Freeman was not educated enough to hold her position as Director and stated, "if [Freeman] thought

_____

[5] This court assumes for purposes of this motion that the interaction between McMahan and Peterson occurred in February 2020, consistent with Plaintiff's deposition testimony. (See Battle Dep. (Doc. 21-2) at 53-54.) However, according to Cleary, Peterson's employment with Hickory ended around September 2019, (Cleary Decl. (Doc. 21-7) ¶ 7), months before Defendant assumed control of Hickory, (see id.).

[6] Again, this Court assumes this interaction occurred in February 2020. (See supra n.5.)

- 7 -

it was easy to collect, she could sit her [B]lack ass down and collect" ("the Freeman comment"). (Id. at 66–67, 72.)

In April or May 2020, McMahan turned away a Black patient because they could not afford their co-pay. (Id. at 80–81.) The clinic's policy was to see all patients, regardless of their ability to pay the co-pay, unless they were receiving an elective procedure. (See Cleary Dep. (Doc. 21-9) at 38–39, 61–63.)[7] Despite this policy, Plaintiff observed McMahan repeatedly turn away Black patients who could not make their co-pays but did not witness her turn away White patients who could not afford their co-pays. (See Battle Dep. (Doc. 21-2) at 81, 83.) This behavior continued until Plaintiff's termination. (See id.)

## B. Plaintiff Reports McMahan's Statements

Plaintiff contends she first reported McMahan's comments to Buchanan on January 1, 2020. (See id. at 44, 47.) Plaintiff later reported McMahan's comments to Freeman in February 2020. (Id. at 73.) On or around March 16, 2020, Plaintiff contacted

---

[7] While Cleary stated that this was the clinic's policy in her deposition, Lynch stated there was a policy that granted providers discretion to turn away patients "[i]f they are noncompliant in paying any of their copays or if they have a significant past-due balance." (Lynch Dep. (Doc. 21-22) at 49–50.) Regardless, this court infers from Plaintiff's testimony that Plaintiff observed McMahan make the unilateral decision to turn away Black patients in violation of clinic policies.

- 8 -

Human Resources via an internal complaint software. (See Ex. H,
ServiceNow HR Req. & Investigation Notes ("HR Req. & Notes")
(Doc. 21-11) at 1 (noting that the case file was opened on
March 16, 2020).) Catherine McMath, a teammate relations
consultant responsible for investigating complaints, responded
to her inquiry. (See McMath Dep. (Doc. 21-12) at 10; Battle
Dep. (Doc. 21-2) at 75-76.) In an April 8, 2020 email to
McMath, Plaintiff reported McMahan's comments about the Obamas,
the monkey drawing, the ghetto comment, and the Freeman comment
to McMath. (See Ex. K, Emails from Pl to McMath RE Complaints
("Pl & McMath Emails") (Doc. 21-14) at 1.) Plaintiff told
McMath that these were "just a few of [McMahan's] comments."
(Id.) Plaintiff stated in her deposition that she reported to
McMath all the racial comments McMahan had made, including the
dark skin comment and the Medicaid comment. (See Battle Dep.
(Doc. 21-2) at 76-77.)[8]

While Plaintiff did not report any of McMahan's racist
comments to Lynch or Cleary, (id. at 74), sometime in April
2020, Plaintiff told Cleary that McMahan was turning away Black
patients who could not make their co-pays, but not White

---

[8] Because Plaintiff's statement in the deposition is made
under oath, this court finds that statement asserts the truth
to the best of Plaintiff's recollection for purposes of summary
judgment.

patients who could not make their co-pays. (Id. at 81–82.) Plaintiff also reported this to McMath in May 2020. (Id. at 82–83.)

Additionally, in June or July of 2020, Plaintiff verbally reported to Reed the dark skin comment, the comments about the Obamas, the Freeman comment, the ghetto comment, and that McMahan turned away Black patients who could not make the co-pay. (See Battle Dep. (Doc. 21–2) at 78–80.)

Defendant disputes that Plaintiff reported McMahan's comments in the ways she described. (See MSJ Br. (Doc. 21) at 12 (claiming that Plaintiff first reported McMahan's comments after a May 2020 incident, that she sometime thereafter reported certain comments to Freeman, and that she made another report on or about February 1, 2021).) However, this court must construe the facts in the light most favorable to Plaintiff, see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986), and credits Plaintiff's deposition testimony that she made numerous reports to supervisory WFBMC employees beginning on January 1, 2020.

C. **Defendant Investigates Plaintiff's Allegations**

According to McMath, she received a complaint from Plaintiff through Defendant's internal complaint software and contacted Plaintiff to discuss Plaintiff's concerns. (See

McMath Dep. (Doc. 21-12) at 17-18; see also Pl & McMath Emails (Doc. 21-14).) McMath testified that Plaintiff accused a coworker of being racist, said the coworker was not held accountable, and expressed a feeling that Plaintiff was being discriminated and retaliated against. (McMath Dep. (Doc. 21-12) at 19-20.) Specifically, Plaintiff reported the ghetto comment, the Michelle Obama comment, the dark skin comment, the monkey drawing, McMahan's disparaging comments about Black patients in the clinic, and that McMahan treated Black patients who were unable to pay their co-pay differently than White patients who were unable to pay their co-pay. (Id. at 24-25.)

    After hearing Plaintiff's allegations, McMath contacted Lynch and Cleary, and McMath asked them to investigate Plaintiff's complaint. (Id. at 20-21.)[9] According to McMath, Lynch and Cleary interviewed all the PSRs at the Hickory location but "were unable to substantiate [Plaintiff's]

_____

    [9] Cleary testified slightly differently. She stated that she first learned of Plaintiff's complaints in a meeting between Freeman, Plaintiff, and herself. (See Cleary Dep. (Doc. 21-9) at 52-53.) After the meeting, Cleary and Lynch approached McMath with their concerns. (Id. at 53.) According to Cleary, Plaintiff told her that "people were racist in the office" but refused to elaborate further. (See id. at 51-52, 54.) Cleary stated she was never told about the monkey drawing, the dark skin comment, the ghetto comment, or McMahan allegedly turning away Black patients who could not afford their co-pays. (Id. at 58-60.) Cleary said she was aware Plaintiff felt she was being retaliated against. (Id. at 63-64.)

claims." (Id. at 25; see also Cleary Dep. (Doc. 21-9) at 54; HR Req. & Notes (Doc. 21-11) at 3-4.) An April 30, 2020 email from Lynch to McMath stated that none of the Hickory PSRs, other than Plaintiff, had heard any racial comments or slurs in the office. (See HR Req. & Notes (Doc. 21-11) at 3-4.) McMath also spoke with McMahan, who denied the allegation that she "ma[d]e race-related comments." (McMath Dep. (Doc. 21-12) at 42.)

After the investigation, McMath informed Plaintiff that her complaints could not be substantiated and encouraged Plaintiff to reach out if she had "further concerns." (Id. at 26-27.) According to McMath, Plaintiff responded with "the "same [concerns] that she reported to begin with." (Id. at 27.) At that point, McMath contacted Reed, Lynch and Cleary's director, about Plaintiff's allegations. (Id. at 28.) As Plaintiff and Reed are both Black women, McMath thought including Reed would ensure the investigation had not overlooked anything. (Id.) According to McMath, Reed felt Lynch and Cleary's investigation of Plaintiff's complaints was fair. (Id. at 30.)

McMath also asked Lynch and Cleary to investigate an allegation Plaintiff raised that she was treated differently with respect to days off. (Id. at 22.) Lynch and Cleary reported that all PSRs in the office were treated the same with

- 12 -

respect to time off — the first person to ask for time off was given the time off. (Id. at 22-23.) When Plaintiff asked first, she was given the time off, and when someone else asked first, they were given the time off. (Id. at 23.)

### D. __Allegations of Racial Discrimination__

Plaintiff alleges that after reporting McMahan's racist comments, Lynch and Cleary discriminated and retaliated against her. (Battle Dep. (Doc. 21-2) at 128.)

Plaintiff testified that when Lynch and Cleary visited Hickory, they would ignore Plaintiff, but Lynch would ask McMahan if Plaintiff had "done anything to you today or said anything to you today?" (Id. at 107.) Lynch and Cleary also told Collins that "if [Plaintiff] says anything, you let me know and I'll come running." (See id. at 108, 116.)

Plaintiff also testified that after she had requested paid time off, Lynch amended the schedule, so Plaintiff was not able to take time off. (Id. at 109.) Plaintiff also appeared to allege in her deposition that her paid time off was "taken away." (Id. at 109.) Plaintiff admitted that she did not know whether Lynch made any changes to McMahan's paid time off calendar. (Id. at 111.)

Plaintiff also alleges that she was not allowed to work through her lunch hour and that on occasions when she worked

- 13 -

thirty minute lunches, her "time was taken away." (Id. at 123.)
Plaintiff admits that Lynch and Cleary counseled her not to
intentionally accrue overtime. (See id. at 124.) Additionally,
Cleary's provided uncontradicted testimony that for a PSR to
modify their schedule, they needed pre-approval from Lynch.
(Cleary Dep. (Doc. 21-9) at 46.) Per Plaintiff's deposition
testimony, it appears that when she took a thirty minute lunch
and her "time was taken away," she had not received
pre-approval to work a thirty minute lunch. (See Battle Dep.
(Doc. 21-2) at 123 ("There were times when I asked and [Lynch]
would keep saying no . . . but a couple [of] times I did
take . . . 30-minute lunches. . . and  . . . my time was taken
away.").)

Plaintiff testified that Lynch and Cleary discriminated
against her by blaming her for mistakes made by McMahan and
Collins. (Id. at 116-17.) However, Plaintiff also admitted that
electronic medical records included the name of the last person
who edited them. (See id. at 118.) While Plaintiff stated
McMahan's sister had "IT clearance" and Plaintiff had seen her
remotely access McMahan's desktop on two occasions, (id. at
119-20), Plaintiff also said she had never provided anyone with
her login credentials or knowingly permitted anyone to access
her computer, (id. at 121-22). Plaintiff has presented no

- 14 -

evidence, other than her own speculation, that McMahan's sister
or anyone else altered medical records after Plaintiff worked
on them.

Plaintiff also testified that between January 2021 and
March 2021, someone "ransacked" her desk after she had left
work on four different occasions. (See id. at 100-01.)
Plaintiff stated it looked like someone had been looking for
something. (Id. at 102 ("[Y]ou can tell that somebody was
looking for something because nothing was put back in the place
where it was originally.").) Plaintiff claims she reported
these incidents to McMath twice. (Id. at 103.) Plaintiff
admitted at least four people were in the office with access to
her desk on the occasions when her desk was ransacked, and
neither Plaintiff, nor anyone else, saw who went through her
desk. (Id. at 102-03.) This court is unwilling to find that
Lynch or Cleary ransacked Plaintiff's desk as Plaintiff
insinuates or that the ransacking of Plaintiff's desk is
evidence of racial animus or discrimination.

Additionally, Plaintiff alleges that Lynch told McMahan
information Plaintiff told Lynch in confidence and instructed
McMahan to falsely claim that Plaintiff threatened her life.
(See id. at 88, 97.) This allegation lacks any factual support
in the record. Plaintiff claims that in an April 2020 meeting,

- 15 -

Lynch asked Plaintiff if she had threatened McMahan's life and Plaintiff responded she had not. (Id. at 96-97.) Months later, in a July 2020 meeting, McMahan accused Plaintiff of threatening her life. (Id. at 96.) These two facts are insufficient to create an inference that Lynch either violated Plaintiff's confidences or instructed McMahan to falsely accuse Plaintiff of threatening her life.

### E. Allegations of Retaliation

Plaintiff's allegations of retaliation prior to her termination largely overlap with her claims of racial discrimination. However, while Plaintiff contends that only Lynch and Cleary discriminated against her, she alleges that Lynch, Cleary, and Reed, retaliated against her. (Id. at 128-29.) Specifically, she claims that Cleary and/or Lynch retaliated against her by, among other things: blaming her for other people's mistakes, (id. at 129, 140); openly discussing Plaintiff's replacement in front of Plaintiff prior to

Plaintiff's termination, (id. at 129-34);[10] telling Plaintiff she could arrive five minutes early "to get [her] in trouble," (id. at 139); telling McMahan to falsely claim Plaintiff threatened her life, (id. at 141); and not allowing Plaintiff to take time off she requested, (id. at 141). Additionally, Plaintiff claims that Reed retaliated against her by writing her up. (Id. at 142-43.)[11]

**F.  Performance Issues**

During Plaintiff's employment, Defendant utilized a four step corrective action process to address employee performance

---

[10] Plaintiff claims that from December 2020 to February 2021, Cleary spoke to Collins and McMahan about Plaintiff's replacement within earshot of Plaintiff. (See Battle Dep. (Doc. 21-2) at 129-38.) Cleary stated in an affidavit that the decision to fire Plaintiff was not made until on or around March 3, 2021, a job opening was posted on March 22, 2021, and the position was not filled until May 17, 2021. (Cleary Decl. (Doc. 21-7) ¶¶ 15-16.) However, the fact that a replacement was not hired until after Plaintiff's termination does not preclude the possibility that Cleary was being untruthful when discussing Plaintiff's replacement. Such a credibility determination is for a jury, not this court.

[11] Plaintiff also claimed that Reed retaliated against her in relation to the insurance class because Plaintiff gave her a reason she could not attend the class. (Battle Dep. (Doc. 21-2) at 144.) However, Plaintiff's refusal to attend the class, even crediting her argument she gave Reed a reason she could not attend, does not mean that Reed's insistence Plaintiff attend the class was retaliatory. (See id.) Additionally, while Plaintiff contends her tires were not sufficient to make the drive to Winston-Salem, she did not ask whether there was anyone she could carpool with to the class or consider other transportation options. (Id. at 146.)

- 17 -

issues. (See McMath Dep. (Doc. 21–12) at 34.) The steps were: (1) a verbal advisory documented in writing; (2) a written advisory; (3) a final advisory; and (4) termination. (See id.)

On March 11, 2020, Freeman emailed Plaintiff memorializing a meeting from earlier that day where they had discussed behavioral expectations. (Battle Dep. Cont'd. (Doc. 21–3) at 7–8; Battle Dep. Add'l Exs. (Doc. 21–4) at 4.) The email stated, "[a]ny inappropriate conversations or comments will not be tolerated[.] The next action will result in HR disciplinary action." (Battle Dep. Add'l Exs. (Doc. 21–4) at 4.)

On March 16, 2020, Plaintiff emailed Freeman with concerns about McMahan's work and said, "I seem to be the only one getting [quality assurance audits] and nothing is being said about any of [McMahan's] mistakes." (See Battle Dep. Add'l Exs. (Doc. 21–4) at 5–6.) Freeman responded:

> [a]s always I explain the big picture, everyone's accounts are being reviewed and you have no idea what conversations have taken place. It's quite upsetting to hear from my leadership team the tone and demeanor that has been presented from you during today's conversation. As an adult we must focus on our own actions and not those of others as the accounts we are reviewing are pre-registered and registered accounts. I will be there tomorrow to have a different conversation with you. I don't think [you're] understanding the magnitude of my concerns across the board and how [you're] truly representing yourself. I have the team tracking accounts and logging all activity. I've created an audit trail ticket to watch a full logic behind an account you touch yet you feel [you're] the target. I have to

- 18 -

> differ on those accounts as I am doing my due
> diligence. I look forward to speaking with you
> tomorrow.

(Id.) Plaintiff admitted in her deposition that she does not contend Freeman ever discriminated or retaliated against her. (See Battle Dep. Cont'd. (Doc. 21-3) at 8.)

A March 17, 2020 document from Freeman and Cleary to Plaintiff memorializes a conversation from that day "regarding [Plaintiff's] behavior, her attitude, and demeanor towards leadership and others from the previous day, which is not acceptable behavior and will not be tolerated going forward." (Battle Dep. Add'l Exs. (Doc. 21-4) at 7.)[12] The document stated it was a "verbal warning." (Id.) While Plaintiff denied having seen this document, (see Battle Dep. Cont'd. (Doc. 21-3) at 8), there is no evidence in the record before this court that is not an accurate contemporaneous account of the conversation, nor does Plaintiff contest the account.

---

[12] An email from Lynch to Freeman and Cleary elaborated on the incident referenced in the corrective action. (See Doc. 21-10.) According to the email, during a quality assurance meeting with Lynch and another employee, Teresa, Plaintiff "was yelling at Teresa and telling her that she was wrong and that she (Teresa) didn't know what she was talking about. . . . She told Teresa in an ill manner that she has worked in healthcare for 19 years and she knows what she is doing. Teresa tried to explain to [Plaintiff] that this was just trying to help her understand the issues and why we are having so many denials at Hickory . . . but [Plaintiff] was in disbelief and did not want to hear anything." (Id. (cleaned up).)

- 19 -

Plaintiff's annual review for the period of July 1, 2020 to August 31, 2020 gave her a review of "1 – Action Needed," the lowest possible score. (Battle Dep. Add'l Exs. (Doc. 21-4) at 8.) The review stated Plaintiff's work was "passable, although needs improvement" and that Plaintiff "[d]isplays a poor attitude in the workplace to both leaders and peers." (Id.) Plaintiff admitted seeing this document and recalled discussing her performance review with Lynch. (Battle Dep. Cont'd. (Doc. 21-3) at 9.)

On August 31, 2020, a written corrective action form was prepared.[13] (Battle Dep. Add'l Exs. (Doc. 21-4) at 10-11.) The document recounted "disruptive, rude and unprofessional" behaviors including Plaintiff stating: "'it was so quiet on Friday' when referring to the return of a coworker the following week"; "[i]gnoring specific instructions about time off by taking shorter lunch breaks without supervisor approval"; "exhibiting unprofessional body language such as eye rolling"; and "yelling 'Phone' to another co-worker and slamming drawers at her desk." (Id. at 10.)

---

[13] Though Plaintiff stated in her deposition she had never seen this document before, Reed read the contents of the document to her in a meeting that Plaintiff recorded. (Compare Battle Dep. Cont'd. (Doc. 21-3) at 9-17, with (Battle Dep. Add'l Exs. (Doc. 21-4) at 10-11.)

The corrective action form also stated that "[a]s a result of an investigation by the Medical Center Privacy Office, [i]t has been substantiated that [Plaintiff], unintentionally disclosed confidential information . . . on May 22, 2019. . . . This resulted in an Unintentional HIPPA Privacy Breach." (Id. at 10–11.) Additional information regarding the unintentional disclosure was provided to this court. It appears that Christi Gibson and/or Charles London determined that Plaintiff incorrectly associated one patient's account with another patient's account in the mywakehealth portal. (See Ex. L, May 2020 Privacy Investigation ("Privacy Investigation") (Doc. 21–15) at 4–7.) A patient noticed the discrepancy in their mywakehealth account and reported it to Defendant. (Id. at 5.) The report concluded that Plaintiff had erroneously associated the accounts. (Id. at 5, 7.) There is no allegation or evidence in the record that Lynch, Cleary, or Reed reported the unintentional disclosure or were involved in investigating it;

however, after reviewing the report, they agreed that Plaintiff was responsible for the disclosure. (See id. at 2-3.)[14]

On September 21, 2020, a performance coaching worksheet was executed that stated "[Plaintiff] is leaving patient registration information incomplete" and "[Plaintiff] is not consistently answering patient phone calls as they come in, causing many calls to go to voicemail versus being answered by a . . . representative." (Doc. 21-16 at 1.)

Additionally, on or about October 4, 2020, a quality review of Plaintiff's work was performed by Malinda Durant. (Doc. 21-17 at 3.) Plaintiff received a 64% on the quality review, (id. at 4), which Plaintiff appears to describe as a "[f]ail grade" in a subsequent email to McMath, (see Doc. 21-18 at 1-2).

On February 1, 2021, Lynch executed a final written advisory corrective action form. (Battle Dep. Add'l Exs.

---

[14] The form also stated that Plaintiff "neglected to contact a patient as per protocol for pre-registration, causing the patient confusion as she started to drive to the clinic when in fact her scheduled appointment was to be via video. [Plaintiff] tried one phone number out of three provided by the patient. The one number she called was answered by an unknown individual claiming she had the wrong number. Rather than call the other two numbers or try the first number again, [Plaintiff] chose to not contact the patient going forward and documented the number was incorrect." (Doc. 21-4 at 11.)

(Doc. 21-4) at 15–17.)[15] This form said Plaintiff was "disrespectful and insubordinate to leaders" and provided examples from December 2020 to January 2021 in which Plaintiff allegedly failed to follow the schedule by clocking in early, shortening meal breaks, and saying she needed to leave early without requesting time off in advance. (Id. at 15.) The form also stated that Plaintiff "refuses to adhere to the directives, causing undue disruption between herself, her coworkers[,] and her leadership. This results in an undesirable workplace for all employees in the clinic." (Id. at 15–16.)

G.   **Insurance Class**

In November 2020, Plaintiff was told to take an insurance class in Winston-Salem. (Battle Dep. (Doc. 21-2) at 145.) Plaintiff testified in her deposition she told her supervisors she could not attend because she "did not have . . . a safe enough car to drive down to Winston-Salem." (Id. at 145.) However, an email sent from Plaintiff's WFBMC email address stated, "I do not need this class and I do not want to drive all the way to Winston for this." (Doc. 21-19 at 1.) Lynch forwarded the email to Reed, who responded to Lynch that

_____

[15] Plaintiff again denied receiving a copy of the corrective action form but did not appear to dispute that she was given the corrective action. (Battle Dep. Cont'd. (Doc. 21-3) at 19–20.)

Plaintiff was "required to take the class. Tell her [that] supervisors have taken the class so she's not exempt." (Id. at 1.)[16] Cleary stated that she took the insurance class, (see Cleary Dep. (Doc. 21-9) at 70), and Lynch testified that all other PSRs at Hickory took the course, (Lynch Dep. (Doc. 21-22) at 76-77).

In February 2021, Reed again told Plaintiff to go to the insurance class and Plaintiff again refused. (Battle Dep. (Doc. 21-2) at 149.) Reed informed Plaintiff that failure to attend the class could result in further discipline including the possibility of termination. (Id. at 150.)

## H. **First EEOC Charge**

On February 11, 2021, Plaintiff filed her first Charge of Discrimination with the EEOC. (Battle Dep. Cont'd. (Doc. 21-3) at 41-42.) Plaintiff stated she had been subjected to race discrimination and retaliation. (Id.) Plaintiff testified that

---

[16] During her deposition, Plaintiff was asked about the email sent from her account and said, "I'm not going to say that I wrote this email." (Battle Dep. (Doc. 21-2) at 148.) Plaintiff testified in her deposition that she never provided her computer login information to anyone. (Id. at 121-22.) Because Plaintiff does not dispute that email was sent from her account secured by login information known only to her, Plaintiff's ambiguous statement that she is not going to say she wrote the email is insufficient to rebut an authentication of the email as Plaintiff's email.

sometime in February 2021, she informed Lynch, Cleary, and Reed that she had filed an EEOC charge. (See id. at 5.)

## I.   **Plaintiff's Termination and Second EEOC Charge**

According to Defendant, following Plaintiff's second refusal to attend the insurance class, Reed made the final decision to terminate Plaintiff and communicated that decision to Cleary and Lynch. (See Cleary Dep. (Doc. 21-9) at 74; Lynch Dep. (Doc. 21-22) at 75-76.)

On March 8, 2021, Plaintiff was terminated during a meeting with Cleary and Lynch. (Battle Dep. (Doc. 21-2) at 28-29; Cleary Decl. (Doc. 21-7) ¶ 15.) According to Plaintiff's second EEOC charge (which Plaintiff filed after her termination), during the termination meeting, Defendant "requested that I 'drop' my EEOC claim. However, I refused [Defendant's] request to withdraw[] my EEOC charge. In response, I was terminated. The reason given for my termination was my refusal to accept [Defendant's] demand to withdraw[] my EEOC Charge of Discrimination." (Battle Dep. Cont'd. (Doc. 21-3) at 44.) In her deposition, Plaintiff stated that Cleary and Lynch told her she was being terminated "because [she] filed [a charge] with the EEOC" and that, contrary to what she stated in her second EEOC charge, she was not given

the option to drop her case prior to her termination. (Battle Dep. Cont'd. (Doc. 21-3) at 1-4.)

According to Defendant, Plaintiff was fired for "a pattern of unacceptable behavior including insubordination and failing to follow the direction of her leaders." (Battle Dep. Cont'd. (Doc. 21-3) at 46.) Specifically, Plaintiff's failure to attend the insurance class. (Id.)

Cleary testified that she first learned Plaintiff had filed the first EEOC charge only after Plaintiff had been terminated. (See Cleary Dep. (Doc. 21-9) at 75-76, 78-79 (stating that after Plaintiff was terminated, she screamed at Cleary and Lynch, ran out of the room, and "blurted out" that she had filed an EEOC charge).) Lynch, in contrast, stated she learned Plaintiff had filed the first EEOC charge on March 8, prior to Plaintiff's termination, but stated the decision to terminate Plaintiff had been reached several days earlier. (Lynch Dep. (Doc. 21-22) at 73-76.)

## II. **PROCEDURAL HISTORY**

Plaintiff filed a complaint in this court, (Doc. 1), and subsequently filed an amended complaint, (Am. Compl. (Doc. 9)). Defendant answered the amended complaint. (Answer Am. Compl. (Doc. 11).) Defendant also filed a Motion for Summary Judgment, (Mot. for Summ. J. ("MSJ") (Doc. 20)), and a brief in support,

- 26 -

(Def.'s Mem. in Supp. of its Mot. for Summ. J. ("MSJ Br.")
(Doc. 21)). Plaintiff responded. (Pl.'s Resp. to Def.'s Mot.
for Summ. J. ("MSJ Resp.") (Doc. 25).) Defendant replied.
(Def.'s Reply in Supp. of its Mot. for Summ. J. ("MSJ Reply")
(Doc. 27).) Defendant's motion is ripe for adjudication.

III. **STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a). See
Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). This
court's summary judgment inquiry is whether the evidence "is so
one-sided that one party must prevail as a matter of law."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The
moving party bears the initial burden of demonstrating "that
there is an absence of evidence to support the nonmoving
party's case." Celotex Corp., 477 U.S. at 325. If the "moving
party discharges its burden . . ., the nonmoving party must
come forward with specific facts showing that there is a
genuine issue for trial." McLean v. Patten Cmtys., Inc., 332
F.3d 714, 719 (4th Cir. 2003) (citing Matsushita Elec. Indus.
Co., 475 U.S. at 586-87). "Conclusory or speculative
allegations do not suffice" to defeat a motion for summary
judgment. Thompson v. Potomac Elec. Power Co., 312 F.3d 645,

- 27 -

649 (4th Cir. 2002). Summary judgment should be granted "unless a reasonable jury could return a verdict in favor of the nonmovant on the evidence presented." McLean, 332 F.3d at 719 (citing Liberty Lobby, 477 U.S. at 247–48).

**IV.**   **ANALYSIS**

Plaintiff asserts three causes of action based in Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981: (1) a hostile work environment, (2) race discrimination, and (3) retaliation. (Am. Compl. (Doc. 9) at 5–8.) Defendant seeks summary judgment on all three claims. This court will grant Defendant's motion as to Plaintiff's race discrimination claim and will otherwise deny the motion.

**A.**   **Timeliness and Exhaustion**

In addition to attacking the merits of Plaintiff's claims, Defendant argues that certain allegations in Plaintiff's Title VII hostile work environment claim are untimely and that Plaintiff failed to exhaust her administrative remedies before filing suit. (MSJ Br. (Doc. 21) at 14–15.) This court disagrees.

Defendant first contends Plaintiff may not rely on events which occurred more than 180 days before she filed her first EEOC charge to support her Title VII hostile work environment claim. (Id.)

- 28 -

Under Title VII, a plaintiff is required to file a charge with the EEOC within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). The term "practice" ordinarily applies "to a discrete act or single 'occurrence,' even when it has a connection to other acts." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 111 (2002). Therefore, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire . . . constitute[] a separate actionable 'unlawful employment practice.'" Id. at 114. However, "[h]ostile environment claims are different in kind from discrete acts." Id. at 115.

> A hostile work environment claim is composed of a
> series of separate acts that collectively constitute
> one "unlawful employment practice." 42 U.S.C.
> § 2000e-5(e)(1). The timely filing provision only
> requires that a Title VII plaintiff file a charge
> within a certain number of days after the unlawful
> practice happened. It does not matter, for purposes
> of the statute, that some of the component acts of
> the hostile work environment fall outside the
> statutory time period. Provided that an act
> contributing to the claim occurs within the filing
> period, the entire time period of the hostile
> environment may be considered by a court for the
> purposes of determining liability.

Id. at 117. Plaintiff alleges that McMahan's statements created a hostile work environment. (Am. Compl. (Doc. 9) ¶ 20.) According to Plaintiff, McMahan's dark skin comments were a near-daily occurrence beginning in January 2020, and McMahan's

- 29 -

Medicaid comments were a near-daily occurrence starting in February 2020. (See supra Section I.A.) Those statements, as well as the other offensive statements McMahan made, together constitute one alleged unlawful employment practice that comprises the alleged hostile work environment. Therefore, Plaintiff may rely on conduct that occurred more than 180 days before she filed her EEOC charge to support her Title VII hostile work environment claim.

Next, Defendant argues that Plaintiff failed to exhaust her administrative remedies because her amended complaint and deposition testimony include allegations not asserted in her EEOC charge. (See MSJ Br. (Doc. 21) at 15.)

Before a plaintiff may file a lawsuit, she must file an administrative charge with the EEOC. 42 U.S.C. § 2000e-5(f)(1). "The scope of the plaintiff's right to file a federal lawsuit is determined by the charge's contents." Jones v. Calvert Grp., 551 F.3d 297, 300 (4th Cir. 2009). "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996). For example, if the EEOC charge alleges discrimination on one basis, such as

- 30 -

sex, but not on another basis such as race, a plaintiff may not maintain a claim of race discrimination in subsequent litigation. See id. Additionally, "the allegation of a discrete act or acts in an administrative charge is insufficient when the plaintiff subsequently alleges a broader pattern of misconduct." Chacko v. Patuxent Inst., 429 F.3d 505, 509 (4th Cir. 2005). "At the same time, however, if the factual allegations in the administrative charge are reasonably related to the factual allegations in the formal litigation, the connection between the charge and the claim is sufficient." Id.

Here, Plaintiff's first EEOC charge checked the boxes for race discrimination and retaliation. (Battle Dep. Cont'd. (Doc. 21-3) at 41.) It also alleged Plaintiff was "subjected to racial supremacist comments from a co-worker . . . who daily expose[d] me to her racial theories and verbal comments about how African Americans are inferior. She also commented . . . that an African American Director (female), was less competent and educated than her white manager who[] . . . should have had the Director's job." (Id.) The charge went on to add that "I am subjected to a hostile work environment." (Id. at 42.) The charge lists the dates of discrimination as August 1, 2020 to February 1, 2021 and checked the box for continuing action. (Id. at 41.)

Plaintiff's hostile work environment claim is based on the derogatory statements McMahan made about Black people: the dark skin comment, the Medicaid comment, and her comments about Michelle Obama and Freeman (the director referenced in the EEOC charge) (see supra Section I.A.). Most, if not all, of these statements could fairly be considered statements "about how African Americans are inferior." (Battle Dep. Cont'd (Doc. 21-3) at 41.) Additionally, Plaintiff directly referenced the comments about Freeman — a Black director McMahan said did not deserve the position — in her EEOC charge. (Id.)

In fairness to Defendant, Plaintiff's EEOC charge omits certain details Plaintiff provided in her deposition. For instance, the charge makes no reference to the monkey drawing, nor does it reference McMahan turning away Black patients who could not pay the co-pay. (Id. at 41–42.) Additionally, and perhaps most glaringly, the charge states the hostile work environment began August 1, 2020. (Id. at 41.) In her deposition, Plaintiff stated that McMahan began making racist statements on January 1, 2020, seven months before the date identified in the EEOC charge. (Compare Battle Dep. (Doc. 21-2) at 38–39, 44–47, with Battle Dep. Cont'd. (Doc. 21-3) at 41.) Similarly, the specifically racist comments Plaintiff now claims occurred are very different from the general

- 32 -

descriptions Plaintiff included in her EEOC charge, those discrepancies will have to be resolved by a jury.

Ultimately, Plaintiff's EEOC charge identified the person creating the hostile work environment, a White female PSR, roughly identified the kinds of statements at issue, "racial supremacist comments" and comments about "an African American Director," and stated she was subject to a hostile work environment. (See Battle Dep. Cont'd. (Doc. 21-3) at 41.) Therefore, this court finds "the factual allegations in the administrative charge are reasonably related to the factual allegations in the formal litigation," Chacko, 429 F.3d at 509, notwithstanding the fact that Plaintiff's EEOC charge failed to properly identify when the comments began.

## B.  **Hostile Work Environment**

Defendant argues Plaintiff cannot demonstrate she was subjected to a hostile work environment because the alleged harassment was not severe and pervasive and any harassment is not imputable to Defendant. (MSJ Br. (Doc. 21) at 15-18.)

"When racial animus . . . creates a hostile work environment, requiring an affected employee to work in it amounts to intentional racial discrimination by the employer and is actionable under Title VII." McIver v. Bridgestone Americas, Inc., 42 F.4th 398, 407 (4th Cir. 2022). To prevail

- 33 -

on a hostile work environment claim under Title VII or
42 U.S.C. § 1981, "a plaintiff must show that there is
(1) unwelcome conduct; (2) that is based on the plaintiff's
race; (3) which is sufficiently severe or pervasive to alter
the plaintiff's conditions of employment and to create an
abusive work environment; and (4) which is imputable to the
employer." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264,
277 (4th Cir. 2015) (cleaned up). Ordinarily, the "very nature
[of a hostile work environment claim] involves repeated
conduct." Morgan, 536 U.S. at 115. "[H]owever, an isolated
incident of harassment can amount to discriminatory changes in
the terms and conditions of employment, if that incident is
extremely serious." Boyer-Liberto, 786 F.3d at 277 (internal
citations and quotations omitted).

    In evaluating the third element, the severity and
pervasiveness of harassing conduct, a court "looks to all the
circumstances, including the frequency of the discriminatory
conduct; its severity; whether it is physically threatening or
humiliating, or a mere offensive utterance; and whether it
unreasonably interferes with an employee's work performance."
McIver, 42 F.4th at 408 (internal citations and quotations
omitted). The work environment must be objectively and
subjectively hostile to satisfy this requirement. Coleman v.

- 34 -

Whitley, No. 21-1181, 2022 WL 16630570, at *2 (4th Cir. Nov. 2, 2022) "The status of the harasser is also a 'significant factor' to be considered; harassment by a supervisor tends to be more serious, while harassment by a co-equal is less serious." McIver, 42 F.4th at 408 (citation omitted).

The harasser's identity is also relevant to the fourth element — whether the harassment may be imputed to the employer. "Liability may be imputed . . . if the employer had actual or constructive knowledge of the existence of a hostile working environment and took no prompt and adequate remedial action." Coleman, 2022 WL 16630570, at *2.

Plaintiff's deposition testimony establishes, for purposes of summary judgment, that on January 1, 2020, McMahan made the dark skin comment. (See Battle Dep. (Doc. 21-2) at 38-39, 44-47.) McMahan then repeated this comment almost every day until Plaintiff was terminated, one year and three months later. (See id. at 39-41, 44.) In February 2020, McMahan made the Medicaid comment in response to a Black patient checking in with Medicaid insurance. (See Battle Dep. (Doc. 21-2) at 63-64.) McMahan added this comment to her repertoire of racist insults and made it approximately 20 times per month. (See Battle Dep. (Doc. 21-2) at 65.) Against this backdrop of repeated racist comments about Black patients, McMahan made the

Michelle Obama comment and produced the monkey drawing. (Id. at 55.) In the same interaction, McMahan called a Black coworker a racist name and asked Plaintiff "how's that for racist." (Id. at 68-69.)

Considering first the Michelle Obama comment, "describing an African-American as a 'monkey,' and thereby 'suggest[ing] that a human being's physical appearance is essentially a caricature of a jungle beast, goes far beyond the merely unflattering; it is degrading and humiliating in the extreme.'" Boyer-Liberto, 786 F.3d at 280. Though the comment about Michelle Obama was not directed at Plaintiff, commenting that any Black person looks like a monkey is odious and objectively offensive. Likewise, saying all Black people are recipients of a particular welfare program plays into invidious stereotypes and is objectively offensive. Finally, McMahan's comments that a group of people with the same skin tone "stink" demonstrates an obvious racial bias against that group and again, is objectively offensive. Notably, Cleary and McMath both agreed that it would violate Defendant's policies for an employee to make these kinds of statements. (See Cleary Dep. (Doc. 21-9) at 58-60; McMath Dep. (Doc. 21-12) at 43-46.) Plaintiff's repeated complaints about McMahan's comments demonstrates that she found them to be subjectively offensive.

Defendant argues the statements were not severe or pervasive by ignoring many facts Plaintiff outlined in her deposition and characterizing her complaints as identifying "a few isolated incidents." (See MSJ Br. (Doc. 21) at 17.) However, plaintiff testified that derogatory comments were a near-daily occurrence for over a year. (See supra Section I.A.) Defendant is correct that McMahan was a "nonsupervisory coworker," (MSJ Br. (Doc. 21) at 17), but even acknowledging that fact, given the nature and frequency of McMahan's comments, this court finds that a reasonable jury could conclude they were "sufficiently severe or pervasive to alter [Plaintiff's] conditions of employment and to create an abusive work environment." Boyer-Liberto, 786 F.3d at 277.

Next, Defendant argues that the comments cannot be imputed to Defendant because Defendant promptly investigated the comments in March 2020. (MSJ Br. (Doc. 21) at 17–18.) This court finds Defendant's argument unpersuasive. Plaintiff testified she reported McMahan's dark skin comment to Paula Buchanan on January 1, 2020. (See Battle Dep. (Doc. 21-2) at 69-70.) Therefore, Defendant's investigation of the comments, which commenced in March 2020 after Plaintiff

- 37 -

complained to human resources, (see HR Req. & Notes (Doc. 21-11)), did not promptly follow her initial complaint.[17]

From these facts, a reasonable jury could conclude that Defendant failed to take "prompt and adequate remedial action," upon learning of Plaintiff's complaints. Coleman, 2022 WL 16630570, at *2 (emphasis added). The investigation began three months after Plaintiff reported the comments to her supervisor and the investigation failed to stop McMahan from making the same comments. (See Battle Dep. (Doc. 21-2) at 39-40, 63-65 (stating McMahan's dark skin and Medicaid comments were an almost daily occurrence until Plaintiff's termination).) Thus, this court will deny Defendant's Motion for Summary Judgment as to Plaintiff's hostile work environment claim.

---

[17] Defendant appears to urge this court to ignore Plaintiff's deposition testimony that she reported McMahan's comments in January 2020 because her amended complaint "acknowledges a lack of reporting to anyone in management." (MSJ Br. (Doc. 21) at 17.) More precisely, Plaintiff's amended complaint states she was first subjected to a racially hostile work environment in May 2020, that she "did not initially report [McMahan's] comments to management," and that she first reported the comments in June 2020. (Am. Compl. (Doc. 9) ¶¶ 8-12.) However, Plaintiff's amended complaint is not a verified complaint, (see id.), and Defendant denied this allegation in its answer, (see Answer Am. Compl. (Doc. 11) ¶¶ 8-12.) Therefore, this court does not accept the facts in Plaintiff's amended complaint as true for purposes of summary judgment.

C.    **Race Discrimination**

Next, Defendant argues this court should grant summary judgment in its favor on Plaintiff's race discrimination claim because she cannot show: (1) that her job performance was satisfactory; (2) that similarly situated White employees were treated more favorably; and (3) that the reason for her discharge was pretextual. (MSJ Br. (Doc. 21) at 18-21.) Plaintiff does not respond to Defendant's argument that Plaintiff's job performance was unsatisfactory but contends, without providing a single citation to the record, that White employees were treated more favorably than Plaintiff. (See MSJ Resp. (Doc. 25) at 11.)

A plaintiff can make out a claim of racial discrimination "through direct or circumstantial evidence, or, alternatively, can establish the claim under the McDonnell Douglas burden-shifting framework." Sanders v. Tikras Tech. Sols. Corp., 725 F. App'x 228, 229 (4th Cir. 2018)(internal citation omitted). The McDonnell Douglas framework can be applied to cases arising under Title VII or § 1981. See id. The elements of a prima facie case of race discrimination under Title VII and § 1981 are the same. See id. at 229-30. The plaintiff must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and

- 39 -

(4) different treatment from similarly situated employees outside the protected class." Coleman v. Maryland Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010).

"To create a triable issue of fact as to satisfactory job performance, a plaintiff must demonstrate that he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action. Critically, under this element, it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." Giles v. Nat'l R.R. Passenger Corp., 59 F.4th 696, 704 (4th Cir. 2023)(cleaned up). "Title VII [and § 1981] '[were] not intended to immunize insubordinate, disruptive, or nonproductive behavior at work.'" Sadeghi v. Inova Health Sys., 251 F. Supp. 3d 978, 992 (E.D. Va. 2017) (citing Armstrong v. Index J. Co., 647 F.2d 441, 448 (4th Cir. 1981)).

Here, Plaintiff does not provide direct evidence of racial discrimination by management or decisionmakers, so this court analyzes her claim under the McDonnell Douglas framework. This court finds that Plaintiff cannot demonstrate "satisfactory job performance." Coleman, 626 F.3d at 190.

The record on this issue is somewhat complicated by Plaintiff's claim in her deposition that "[e]very

- 40 -

write-up . . . against me was [for] mistakes that my coworkers
were making. They were not my mistakes." (Battle Dep.
(Doc. 21-2) at 140.) As conclusory allegations are insufficient
to defeat a motion for summary judgment, see Thompson, 312 F.3d
at 649, and it is "the perception of the decision maker . . .
not the self-assessment of the plaintiff," Giles, 59 F.4th at
704, that is relevant, Plaintiff's conclusory assertion that
she was not to blame for certain mistakes is irrelevant.

Plaintiff contends Lynch and Cleary unfairly blamed her
for mistakes made by her co-workers. However, Plaintiff offers
no evidence from which this court can find that the allegedly
erroneous blame arose intentionally or mistakenly. Nor does
Plaintiff provide evidence of any specific mistake which was
erroneously attributed to her with knowledge of the error by
the decisionmaker. Because it is the perception of the
decisionmaker that is relevant, see id., Plaintiff has not
presented evidence to materially dispute the fact that
Plaintiff made mistakes as found by Defendant.

Furthermore, Defendant has presented evidence that
Plaintiff was terminated for "a pattern of unacceptable
behavior including insubordination and failing to follow the
direction of her leaders." (See Doc. 21-3 at 46.) This court
has been presented with no evidence that Plaintiff's

performance was satisfactory even if she was not responsible for the mistakes. Instead, undisputed facts in the record make it clear Defendant reasonably considered Plaintiff's job performance unsatisfactory.

First, Plaintiff has a documented pattern of behavioral issues in the workplace.[18] In March 2020, Freeman (who Plaintiff does not allege discriminated or retaliated against her) (Battle Dep. Cont'd. (Doc. 21-3) at 7), wrote an email following up with Plaintiff regarding behavioral concerns, (see Battle Dep. Add'l Exs. (Doc. 21-4) at 4). Days later, Freeman responded that she was upset about the "tone and demeanor" Plaintiff presented in a conversation that day. (Id. at 5.) Freeman counseled that "[a]s an adult we must focus on our own actions and not those of others as the accounts we are reviewing are pre-registered and registered accounts . . . I don't think [you're] understanding the magnitude of my concerns across the board and how [you're] truly representing yourself." (Id.) The following day, Plaintiff received a verbal corrective action from Freeman and Cleary. (Id. at 7.) The corrective

---

[18] While Plaintiff claims she was unfairly targeted by her managers, (see, e.g., Battle Dep. Cont'd. (Doc. 21-3) at 10), and that she never received some documentation of her behavioral reprimands, (see, e.g., id.; Battle Dep. (Doc. 21-2) at 33), she does not appear to dispute that Defendant documented numerous behavioral concerns, nor does she allege Defendant's concerns about her behavior were unfounded.

action stated Plaintiff's behavior "is not acceptable . . . and will not be tolerated going forward." (Id.)

Lynch noted that Plaintiff's behavioral issues continued throughout her employment. While Plaintiff contends Lynch retaliated against her by telling McMahan to make false accusations about Plaintiff, punishing Plaintiff for co-workers' mistakes, and manipulating the schedule, (see Battle Dep. (Doc. 21-2) at 141), Plaintiff has presented no evidence to dispute Lynch's testimony that Plaintiff had a poor attitude, was disruptive, disrespectful, and insubordinate to leaders. (See Doc. 21-4 at 8 (Lynch wrote on Plaintiff's Annual Performance Review that Plaintiff "[d]isplays a poor attitude in the workplace to both leaders and peers [and] [d]oes not show a team-focused mindset."); id. at 10 (Lynch wrote on an August 31, 2020 corrective action form that "[Plaintiff] continues to be disruptive to the department by: [m]aking disrespectful, rude, and unprofessional comments to or in the presence of coworkers."); id. at 15 (noting on Plaintiff's final corrective action form that she had been "disrespectful and insubordinate to leaders by . . . [e]ngaging in unprofessional communication with her supervisor when given directives with which she does not agree").) Moreover, while Plaintiff stated that she was blamed for her coworkers'

- 43 -

mistakes, (Battle Dep. (Doc. 21-2) at 140), issues with Plaintiff's attitude and behavior are uniquely individual — this court cannot fathom how a poor attitude by another PSR could somehow have been misattributed to Plaintiff, nor does Plaintiff allege such a misattribution occurred.

Second, Plaintiff unintentionally disclosed a patient's protected health information in May 2020. (See Privacy Investigation (Doc. 21-15).) The unintentional disclosure was identified by a patient who saw another patient's information on her mywakehealth account and reported the issue to customer service. (See id.) The disclosure appears to have been investigated by Christi Gibson and/or Charles London. (Id. at 4-5.) There is no evidence in the record that Lynch or Cleary were involved in determining that Plaintiff was responsible, nor does Plaintiff raise a material dispute as to the unintentional disclosure. This provides evidence of unsatisfactory job performance wholly unrelated to an assessment by Lynch or Cleary.

Third, Plaintiff admitted that she was told to attend an insurance class by her supervisors and refused to do so twice — once in November 2020 and a second time in February 2021. (Battle Dep. (Doc. 21-2) at 144-45, 149-50.) All other PSRs at Hickory took the course. (Lynch Dep. (Doc. 21-21) at 76-77.)

- 44 -

Plaintiff has failed to point to any evidence suggesting her job performance was satisfactory. Plaintiff's response to Defendant's motion fails to even mention this element of the prima facie test. (See MSJ Resp. (Doc. 25) at 11.)

Taken together, the evidence demonstrates that Plaintiff had a poor attitude at work, that she unintentionally disclosed a patient's protected health information, and that she engaged in insubordination on two occasions by refusing a direct order. Based on these facts, this court finds Plaintiff cannot show "satisfactory job performance," as required to make out a prima facie case of race discrimination. Coleman, 626 F.3d at 190. Thus, summary judgment for Defendant on this claim is proper. As Plaintiff cannot show her satisfactory job performance, this court declines to address Defendant's arguments on the other elements of Plaintiff's prima facie case.

### D. **Retaliation**

Finally, Defendant seeks summary judgment on Plaintiff's retaliation claim on the grounds that Plaintiff cannot show a causal connection between protected activity and her termination. (MSJ Br. (Doc. 21) at 21–22.) Plaintiff argues that the temporal connection between Plaintiff's complaints (both to human resources and the EEOC) and her termination

- 45 -

suffices to satisfy the causality requirement. (MSJ Resp.
(Doc. 25) at 13-14.)

"A plaintiff may demonstrate retaliation through either
direct evidence of retaliation or through the McDonnell Douglas
burden-shifting framework. Direct evidence encompasses conduct
or statements that both (1) reflect directly the alleged
retaliatory attitude, and (2) bear directly on the contested
employment decision." Johnson v. United Parcel Serv., Inc., 839
F. App'x 781, 783 (4th Cir. 2021) (internal citations and
quotations omitted)(cleaned up).

Here, while both parties analyze this case under the
McDonnell Douglas burden-shifting framework, (compare (MSJ Br.
(Doc. 21) at 21-22, with MSJ Resp. (Doc. 25) at 11-15), there
is direct evidence of retaliation in the record. First, in
Plaintiff's second EEOC charge, she stated under penalty of
perjury that:

> On around March 8, 2021, [Defendant] requested that I
> 'drop' my EEOC claim. However, I refused
> [Defendant's] request to withdraw[] my EEOC charge.
> In response, I was terminated. The reason given for
> my termination was my refusal to accept [Defendant's]
> demand to withdraw[] my EEOC Charge of
> Discrimination.

(Battle Dep. Cont'd. (Doc. 21-3) at 44.) Plaintiff modified her
account slightly in her deposition; she testified Cleary and
Lynch told her that she was being fired because she would not

- 46 -

drop her EEOC charge, and they did not give her an opportunity
to drop the charge. (See Battle Dep. (Doc. 21-2) at 28-29.)

Whether this court credits the version of events outlined
in Plaintiff's EEOC charge or her deposition, they provide
direct evidence of retaliation.[19] First, they "reflect directly
the alleged retaliatory attitude," Johnson, 839 F. App'x
at 783, namely that Lynch and Cleary wanted to retaliate
against Plaintiff for filing an EEOC charge. Second, they "bear
directly on the contested employment decision." Johnson, 839 F.
App'x at 783. The statements were made in the same conversation
in which Plaintiff was terminated and they were the verbal
reason Plaintiff claims she was provided for her termination.
While Defendant claims Plaintiff was fired for "a clear pattern
of poor performance, insubordination, failure to adhere to
policy, and a lack of professionalism, which did not improve
over time and culminated in [Plaintiff's] blatant
insubordination by failing to attend the February 23, 2021
training as specifically directed by her leaders," (MSJ Br.

---

[19] Notably, in this context, this evidence of retaliation
does not aid Plaintiff's discrimination claim. "[R]etaliating
against a person for filing charges of [race] discrimination is
not the same as discriminating against a person on grounds of
[race]." Wilcox v. Lyons, 970 F.3d 452, 461 (4th Cir. 2020)
(citing Yatvin v. Madison Metro. Sch. Dist., 840 F.2d 412, 418
(7th Cir. 1988)). As Plaintiff has proffered no evidence of
race discrimination, that claim still fails. (See supra Section
IV.C.)

(Doc. 21) at 22), the genuine dispute of material fact as to
what Plaintiff was told during her termination makes summary
judgment on this issue improper.

V.    **CONCLUSION**

       For the foregoing reasons, this court will grant in part
and deny in part Defendant's motion for summary judgment.
(Doc. 20.) This court finds that there is a genuine dispute of
material fact as to whether Plaintiff was subjected to a hostile
work environment and whether she was terminated in retaliation
for complaining about that hostile work environment. Thus, this
court will deny Defendant's motion as to those claims. However,
Plaintiff's claim for race discrimination fails because there is
no genuine dispute that she was not satisfactorily performing
her job at the time of her termination.

       For the foregoing reasons,

       **IT IS THEREFORE ORDERED** that Defendant's Motion for Summary
Judgment, (Doc. 20), is **GRANTED IN PART AND DENIED IN PART**. The
motion is **GRANTED** as to Plaintiff's claim of race discrimination.
The motion is **DENIED** as to Plaintiff's hostile work environment
and retaliation claims.

       This the 31st day of July, 2023.

                                    _____
                                    United States District Judge

- 48 -